IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Dennis A. Badertscher,                  Case No. 3:08CV968

       Plaintiff

v.                                         ORDER

The Procter & Gamble Mfg. Co.,

       Defendant

This is an employment discrimination case in which the plaintiff, Dennis A. Badertscher, claims that the defendant, Procter & Gamble, fired him on the basis of his race, gender and age. Plaintiff, a white male, was fifty-two years old when defendant fired him. He brings reverse race and gender discrimination claims, an age discrimination claim and a claim under ERISA.

Pending is defendant's motion for summary judgment. [Doc. 22]. Defendant claims that plaintiff cannot establish a *prima facie* case as to any of his claims. Even if plaintiff could do so, defendant contends further, it had legitimate non-discriminatory reasons for firing him: namely, violation of company safety rules, sleeping while on duty and sexual harassment of a female co-worker. In the face of these articulated reasons, defendant asserts that plaintiff is unable to show a triable issue of pretext.

For the reasons that follow, defendant's motion shall be granted

**Background**

Plaintiff was an at-will employee at defendant's laundry detergent plant in Lima, Ohio, from 1984 until his termination in 2007. For most of his time with Procter & Gamble, and when he lost his job, plaintiff was an operating technician in the Heavy Duty Liquids [HDL] Process Department. He was a member of the "B" Team, one of four teams in that department.

Defendant has written policies requiring use of personal protection equipment [PPE] and prohibiting sexual harassment. Plaintiff does not dispute defendant's contention that he knew of the policies.

The management hierarchy begins with the HDL Department Manager, who reports to the Operations Manager, who in turn reports to the Plant Manager.

Procter & Gamble first became aware of possible misconduct on plaintiff's part in mid-December, 2006, when a technician from the "A" Team told Stuart Heflin, HDL Process Area Leader, that he had overheard an argument and crying in the B Team area during the previous night's shift.

Heflin, HDL Department Manager Sam El-Banna and Operations Manager Juan Bailey met with B Team members to learn about possible problems in that unit. At that point, there was no focus on plaintiff. The discussion during that meeting involved job skill progression, pay-increase certification and the perception that more experienced technicians were trying to intimidate the newer hires.

Although Heflin perceived, as a result of the meeting, that there were interpersonal issues among the B Team members, he felt that he needed to learn more, especially from the newer team

members. He decided to meet individual with those individuals. This led to a series of meetings with members of the B Team.

During these meetings several B Team members told Heflin about misconduct on plaintiff's part.

At the first meeting, team member Scott Metcalf said that plaintiff subjected newer team members to intimidation, boasting that he could get new B Team members fired. Metcalf also told Heflin that some of the more experienced technicians, including plaintiff, did not always wear proper PPE when Proctor & Gamble's safety policies required use of such equipment. Metcalf next spoke with B Team member Chad Burkholder, who expressed similar concerns.

A few weeks later, after the holiday break, Heflin resumed his inquiries into possible problems within the B Team. On January 17, 2007, he again spoke privately with Metcalf and Burkholder. Metcalf repeated his observations of plaintiff's failure to wear PPE. He also stated that plaintiff had made repeated threatening comments about getting new technicians fired and told new hires not to go to management.

During this session, Heflin first learned about plaintiff's possible harassment of a female team member. Metcalf told Heflin that plaintiff "likes touching and feeling on" the female co-worker. Metcalf related several instances where he saw what he thought was inappropriate behavior. Among these instances was one in which plaintiff stuck his finger in a hole in the woman's jeans. On another occasion, plaintiff, noting that the woman's fly was open, approached the woman. Within earshot of Metcalf, plaintiff then whispered in her ear: "Your fly's unzipped, and by the way nice color," referring to her underwear. According to Metcalf, plaintiff often seemed to be "up close and personal" in his conversations with the woman. Metcalf once heard her ask plaintiff: "Why do you have to be so close?"

In addition to these violations of express company policies by plaintiff, Metcalf told Heflin that he had seen plaintiff sleeping on the job. He mentioned an incident when plaintiff disappeared for about three hours. Metcalf and Burkholder went looking for and found plaintiff asleep with the lights off in an isolated, vacant office. Metcalf told Heflin that plaintiff frequently would disappear for a while, then return squinting as though he had been sleeping .

As he would do during several ensuing interviews, Heflin, while speaking with Metcalf, typed simultaneous notes of what Metcalf told him. At the end of the session, Heflin asked Metcalf to review the typed notes, make any desired changes and sign it.

Heflin next spoke with Burkholder, who told Heflin that plaintiff regularly did not wear proper PPE, "joked" about how many new hires had been fired from B Team, and told team members not to go to management. Burkholder said he had seen plaintiff asleep on the job on about twenty times.

Burkholder said that plaintiff "favors females more than males in an obvious way." He reported that he had seen plaintiff put his arm around the same female coworker and "come up behind her and place his knee in the back of her knee causing her weight to shift toward him." He had also heard about the unzipped fly incident, which he had not seen himself. He recalled, though, an instance when plaintiff took the woman with him, instead of the male technician involved with that task, to obtain storm water samples. They were then gone for an excessively long time. Burkholder noted that plaintiff's behavior toward the female co-worker had been particularly heavy during her first three months at the Lima plant. Burkholder also mentioned that plaintiff had been away fifteen to twenty times for hours on end during work shifts.

Like Metcalf, Burkholder reviewed and signed the notes that Metcalf typed as they were talking.

Heflin next contacted Leroy Brown, a Lima Plant Human Resources Manager, to share what he had learned and get Brown's advice about how to proceed. Brown told Heflin that, in accordance with company policy, a full-fledged "fact-finding investigation" into the allegations was necessary. At Brown's direction and standard Proctor & Gamble practice, Heflin asked another manager in the Process Department, Late Product Differentiation [LPD] Area Leader Jennifer Miller, to work with him during the fact-finding investigation.

Brown instructed Heflin to have all statements reviewed and signed.

Heflin and Miller first interviewed the female co-worker on the same day, January 17, 2007, that he had spoken with Metcalf, Burkhoder and Brown. According to Heflin, she was nervous, fearful, upset, and said she did not want to create more tension on the team than there already was or "get anyone in trouble."

Despite the co-worker's reluctance to be involved, she confirmed several of the incidents reported by Metcalf and Burkholder. She told Heflin and Miller that plaintiff had more than once stuck his finger in a hole in her jeans, was "always clothes-lining [*i.e.*, grabbing her around] [her] neck" and patting her leg. She also related that plaintiff had put his knee in the back of her knee "all the time."

Although she did not necessarily view plaintiff's actions as particularly serious, she also stated that he "did make [her] feel uncomfortable at the time." When asked what she would think if plaintiff's actions were to continue for the rest of her career, she said she did not want that.

Although the co-worker had not reported the various incidents to management, she indicated that she felt they were inappropriate. She said she did not like confrontation or want to cause waves.

She also told Heflin and Miller that she had seen plaintiff without proper PPE on multiple occasions and seen him sleeping on the job in the Control Room.

Like the other interviewees, the female co-worker reviewed the notes that Miller typed during the interview. She signed the statement on January 18, 2007, to "make sure what I was signing was the truth."

Later on January 17, 2007, Heflin and Miller also interviewed plaintiff. They told him they were investigating certain allegations of workplace misconduct. Heflin began with general questions, and then allowed plaintiff an opportunity to volunteer information.

Plaintiff admitted hugging the female co-worker six to twelve times, maybe more than once having come behind her, putting his knee behind hers to buckle her knee, and having said something to her when her zipper was down. He, however, denied having commented on the color of her panties. He also denied that she had ever told him he was making her uncomfortable.[1]

Plaintiff acknowledged not having used PPE, including a face shield, raincoat or respirator as required. He admitted other technicians had confronted him about not wearing PPE.

Plaintiff also admitted to sleeping on the job in the past, though he claimed that he had not done so "recently."

He acknowledged the "rumor" that multiple mentees of his had not made it. This was, he asserted, "always used in a joking manner."

After the interview, Proctor & Gamble sent plaintiff home on paid leave. Proctor & Gamble instructed plaintiff not to return to work or discuss the investigation until they concluded it and contacted him.

---

[1] During his deposition, plaintiff admitted to having pressed his knee into the back of knees of four other female employees, so that they would lose balance and fall into him.

The next day, January 18, 2007, Heflin and Miller continued their investigation by separately interviewing B Team member Jane Miller [no relation to Jennifer Miller] and former team member Dawn Steiner.

Although Miller confirmed that plaintiff "usually" did not wear proper PPE, she had not seen any harassment, intimidation or sleeping on the job. Steiner, on the other hand, reported that she had seen multiple incidents of inappropriate behavior by plaintiff toward the female co-worker and other female technicians, including herself. Miller said plaintiff had come up behind her and tickled the small of her back. She also said plaintiff had come up behind the co-worker and placed his knee against the back of the co-worker's, made her jump, and put his hand on hers when seated together in the Control Room. The co-worker had looked "extremely uncomfortable" in certain situations when plaintiff was around, such that she "almost jumped in the trashcan" to avoid him.

Like the other employees interviewed, Miller and Steiner reviewed and signed their statements.

Bailey interviewed B Team member Nikki Garrett on January 19, 2007. She reported that she had seen plaintiff touch the co-worker "a lot on the shoulder or on the leg." She believed plaintiff singled the co-worker out as an object of affection. Garrett said the co-worker had told her that the touching made the co-worker feel uncomfortable. Garrett once heard the co-worker tell plaintiff to "stop touching me." In addition, Garrett stated that plaintiff did not wear his respirator, and that she had seen him sleeping in the Control Room for at least ten minutes.

Heflin and Bailey again interviewed the female co-worker on January 19, 2007, to ask her about specific alleged incidents that had come to light and learn whether they were recent. The co-worker, upset and crying, said that one or two months earlier plaintiff had touched her multiple times in the hole in her jeans. To make him stop, she threw the jeans away.

The incident about her open fly and plaintiff's comment had occurred about three months earlier. Plaintiff's knocking her knees from behind had occurred as recently as her last shift.

A month earlier, she had told plaintiff he was sitting too close to her. She had addressed his conduct more indirectly at other times.

She also related other instances of inappropriate conduct, such as plaintiff blowing on the back of her neck and scaring her while simultaneously touching her chair. This had caused her to "jump[] up in fright" and had been "the most uncomfortable event of all."

She stated that she had told plaintiff to stop touching her, and said such things as "okay, that's enough," "back off," and "why do you have to be so close?" Plaintiff's conduct, however, did not stop. The female co-worker read and signed the written statement reflecting what she said during the interview.

After these fact-finding interviews, Heflin wrote an initial "Process Department Recommendation From Denny Badertscher Fact-Finding" dated January 19, 2007. Miller gave the underlying fact-finding statements to Brown.

Heflin, El-Banna, Bailey, Miller and Brown met to review the documents, ask questions and discuss the investigation. They concluded, based on the what they had learned collectively, that plaintiff had engaged in four types of misconduct: 1) sexually harassment; 2) failure to wear required safety equipment; 3) sleeping on the job; and 4) creating an work environment intimidating toward newer employees.

On the basis of these conclusions, they recommended that Proctor & Gamble fire plaintiff. After this meeting, Brown reviewed the written recommendation and the interviewee statements. He asked Heflin to prepare an "Incident Summary" reciting what had been learned as to each category of misconduct. Doing so with Miller's assistance, Heflin's report stated:

> It is our belief that Denny Badertscher repeatedly sexually harassed [the female co-worker], blatantly and consistently violated department safe practices, repeatedly slept during working hours, and contributed to an environment of intimidation. It is also our belief that Denny has been untruthful with regard to sleeping, intimidation, and sexual harassment during the course of this investigation.

Bailey and Brown presented the recommendation to Phil Gordon, the Site Level Human Resources Manager at the Lima Plant, to whom Brown reported. Gordon's role was to ensure that the investigation accorded with Proctor & Gamble's practices and policies, to provide consultation as necessary and to review the results. He would then either concur or ask for more information. If he concurred, he and Bailey would convey the recommendation to Plant Manager Todd Hoffman for review and final decision. Hoffman was the ultimate decision-maker for Lima plant terminations.

Gordon, Brown and Bailey decided to give plaintiff, as a long-term and capable employee, an opportunity to speak to specific incidents and explain, or acknowledge, his conduct. To do so, Heflin and Miller, at Bailey's and Brown's direction and in Brown's presence, interviewed plaintiff a second time on January 25, 2007. They asked him about the specific allegations under investigation.

Plaintiff denied poking his finger through the hole in the co-worker's jeans, though he admitted "point[ing] to" the hole. He also admitted that he "may have" made reference to the color of her underwear, though in his first interview he had claimed he had "never" done so. Plaintiff also acknowledged that the co-worker had at least once told him to "back off, dude."

Otherwise, plaintiff denied misconduct toward the co-worker.

Heflin, Miller and Brown concluded that plaintiff had done the things his fellow team members attributed to him. They also believed he was not being truthful with them.

Brown and Gordon conducted "historical research," looking for comparable prior employee situations. They concluded plaintiff's misconduct was "more significant" in terms of "the total set

of behaviors," the "number and variety" of infractions, than anything within in the plant's discipline log. While other employees had engaged in, but not been terminated for, conduct in only one of the categories into which plaintiff's actions fell, none had fallen, as plaintiff had, within all the categories.

That being so, Gordon, Brown and Bailey each concluded that termination was warranted. Gordon prepared a Termination Recommendation dated January 26, 2007:

> Recently, information was brought to management's attention regarding [plaintiff's] interactions with members of his team, which prompted an investigation. The conclusions from that investigation are that in recent times Denny has engaged in sexually harassing behavior toward a coworker, has willfully and knowingly [violated] multiple safe practices, and has slept while on the job. In addition, Denny has not been forthcoming and truthful with relevant information during the investigation process. Given the findings of the investigation, Lima plant management recommends that Denny Badertscher's employment be terminated.

Gordon, Bailey and Brown then met with Hoffman for about an hour on January 26, 2007. Hoffman concluded that plaintiff had engaged in three categories of misconduct: 1) violation of safety rules; 2) sexual harassment; and 3) sleeping on the job. Hoffman decided to fire the plaintiff in light of the "combination of the three behaviors taken as a whole."

Bailey and Gordon met with plaintiff on the afternoon of January 26, 2007, to tell him that, due to his several unacceptable behaviors, his employment was terminated. They gave him a termination letter stating the company's reasons for its decision.

Defendant contends, and I agree, that plaintiff's claims of reverse race and gender and age discrimination fail because he cannot: 1) establish a *prima facie* case of any such discrimination; and 2) prove that defendant's articulated legitimate and nondiscriminatory explanations are pretextual.

**Discussion**

**1. Race, Gender and Age Discrimination Claims**

Under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), a plaintiff must initially present a *prima facie* case of discrimination by showing that he: 1) is a within a protected class; 2) suffered an adverse employment action; 3) was qualified for his position; and 4) was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees. *See also e.g.*, *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

Where, as in this case, the plaintiff is a white male, he must also present "background circumstances supporting the suspicion that the defendant is the unusual employer who discriminates against the majority." *E. Leadbetter v. J. Wade Gilley*, 385 F.3d 683, 690 (6th Cir. 2004). A plaintiff can meet this additional burden by presenting evidence of the defendant's unlawful consideration of race (or gender) in past employment decisions. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) (such evidence "justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely"). Alternatively, a white male plaintiff can meet this burden by showing that a supervisor of a race (or gender) different from his own typically hired (or otherwise substantially preferred) people of his own race. *Fuelling v. New Vision Med. Labs.*, 2007 WL 2301162, *3 (N.D. Ohio).

Plaintiff has not met this additional burden with regard to his claims of reverse race and gender discrimination. To be sure, he points to a single request to a selection committee by Bailey in November, 2006, that a black female be selected for a position over a white male. Aside from the fact that the white male, whose score in the application process was one point higher than the black female's, this lone instance by one of many persons involved in the process leading to plaintiff's

termination is wholly insufficient to meet his *prima facie* burden in a reverse discrimination case. Plaintiff has produced no evidence that this conduct was typical of Bailey's approach to employment-related decisions, much less that any of the other persons involved in the investigation and recommendation that plaintiff be fired ever manifested such bias.

Plaintiff has not disputed defendant's evidence that Plant Manage Hoffman made the final decision on his own [though influenced, no doubt, by the record of manifold misconduct assembled by his subordinates]. Plaintiff has failed to show that Hoffman *ever* made *any* employment-related decision that was motivated in whole or in the smallest part by animus towards white males.[2]

Plaintiff failed, in any event, to meet the conventional elements of a *prima facie* case because he has not shown that his replacement was either substantially younger, or of a different gender, race, ethnicity or national background than he. Nor has plaintiff shown that the company treated similarly situated others with those characteristics more favorably than they treated him.

Plaintiff himself testified that the company transferred a forty-nine year old white male from Team A to Team B to take plaintiff's place. Thus, plaintiff's replacement was of the same race and gender as he.

The fact that the replacement was younger than plaintiff does not show age discrimination. The Sixth Circuit has held that a replacement in an age discrimination case must be "substantially younger" to found a claim of age discrimination. *E.g.*, *Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003). A three-year difference is not enough. *Id.*

---

[2] Plaintiff has also not shown that Hoffman's race, ethnic background or national origin differs from his own. Indeed, the record shows that Hoffman, like plaintiff, was a white male.

Nor has plaintiff shown that non-white females or younger persons with records of infractions similar to his own were treated more favorably – *i.e.*, got to keep their jobs while he lost his.

To be sure, plaintiff shows that non-whites, women or younger persons who *either* violated safety rules, slept on the job *or* sexually harassed co-workers stayed employed. But it is not enough for plaintiff to show that the company treated persons committing only one kind of infraction differently. Instead, under *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992), and its progeny, plaintiff must show that other employees whose treatment he compares to his own were in nearly identical positions to raise a *prima facie* inference of discrimination. *See, e.g.*, *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) (plaintiff is "required to prove that all of the *relevant aspects* of his employment situation were 'nearly identical' to those to whom he points as comparable) (emphasis added).

Plaintiff has not shown that others had a record like his. The others' records presented fall into only one of the three categories of misconduct uncovered by the company's investigation. Plaintiff hit the trifecta.

Plaintiff thus has not met his initial burden of showing a *prima facie* case of discrimination.

Nor has he met his ultimate burden of showing that defendant's reasons were not true, but were expressed to mask animus towards him as a white male over the age of forty. *See, e.g.*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07, 519 (1993).

To meet this burden, a plaintiff must present facts demonstrating that the proffered reason either: 1) had no basis in fact; 2) did not actually motivate the plaintiff's discharge; or 3) was insufficient to motivate the discharge. *E.g.*, *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Here, the stated reasons had a factual basis. Plaintiff does not claim that the investigation was either superficial, likely to lead to erroneous conclusions or infected by bias or prejudgment. While plaintiff disputes some – but far from all – of the incidents, he has not, as he must, *id*. at 1084, show that factual falsity flawed defendant's findings.[3]

Plaintiff cannot show that the stated reasons did not actually motivate the company to fire plaintiff. There is simply no way that a rational trier of fact could come to the conclusion that it was more likely than not that something other than plaintiff's tripartite misconduct underlay his termination.

Finally, the reasons expressed by the company are far from insufficient to justify firing plaintiff.

Safety rules are always important. The company could rationally believe that plaintiff, a long-term employee, whom it could expect to set an example for newer workers, violated safety requirements often and openly.

Procter & Gamble paid its employees, including plaintiff, to work, not sleep while on the job.

Sexual harassment is a constant concern. An employer must take prompt and effective action in response to credible allegations of such harassment.

Even if, standing alone, any of these allegations might not have led to plaintiff's dismissal, no rational jury could find that they, together, were not sufficient to cost plaintiff his job.

---

[3] Simple disagreement with the facts uncovered in an employer's investigation does not create a genuine issue of material fact sufficient to defeat summary judgment where an employer has an honest belief in its proffered nondiscriminatory reasons. *E.g.*, *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007).
Procter & Gamble had the requisite "honest belief" in the accuracy of what its investigation disclosed. The company indisputably "made a reasonably informed and considered decision" in which it "reasonably relied on the particularized facts [] before it" when it fired plaintiff. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 399 (6th Cir. 2008).

Plaintiff cannot meet his burden of showing pretext on defendant's part.

### 2. ERISA Claim

Plaintiff also claims that he was within three years of retiring and that losing his job also cost him pension benefits in violation of § 510 of Employee Retirement Income Security Act. 29 U.S.C. § 1140. That provision states, in pertinent part: "It shall be unlawful for any person to discharge . . . or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the [employee benefit] plan."

To state a claim for interference with benefits under § 510, the plaintiff must demonstrate that his employer had a "specific intent" to avoid ERISA liability. *Schweitzer v. Teamsters Local 100*, 413 F.3d 533, 537 (6th Cir. 2005) (citing *Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997)).

Plaintiff has not produced any direct evidence of such specific intent. He has the burden, therefore, of establishing "a *prima facie* case by showing the existence of (1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003).

Where a plaintiff meets this burden, the employer "is able to 'rebut the presumption of impermissible action . . . by introducing evidence of a legitimate, nondiscriminatory reason for its challenged action.'" *Id.*

Here, as with his claims of discrimination, plaintiff fails even to make out a *prima facie* case of impermissible interference with his pension benefits. He has produced no direct or indirect evidence that defendant fired him for the "purpose of interfering" with retirement benefits that he would have been eligible to receive on attaining age fifty-five.

In any event, as already shown, Procter & Gamble articulated several legitimate reasons for its actions, and plaintiff cannot show that those reasons were pretextual

Like his discrimination claims, plaintiff's ERISA claim must be dismissed.

## Conclusion

Plaintiff admitted engaging in some misconduct in each of the three categories on which defendant based its decision to fire him. He disputes solely the frequency, extent and severity of his violations. But defendant, having undertaken a careful and thorough investigation, found his conduct to have been frequent, severe and extensive. In those respects, plaintiff's misconduct exceeded that of the employees whose actions he claims were comparable to his own. Defendant's stated reasons were legitimate, substantial and have not been shown to have been pretextual.

No rational jury could find, on the basis of the record before me, anything else.

It is, therefore,

ORDERED THAT defendant's motion for summary judgment [Doc. 22] be, and the same hereby is, granted.

So ordered.

s/James G. Carr
James G. Carr
Chief Judge